**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No. 25-CR-352-EGS** |
| **GEORGE MATTHEWS-CARR,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**</u>

The defendant, Mr. George Matthews-Carr, by and through his attorney, hereby requests that this Court sentence Mr. Carr to a reasonable period of incarceration[1] that represents a serious downward variance, pursuant to 18 U.S.C. § 3553(a), for the reasons explained below.

**I.     Introduction**

After a childhood marked by neglect and trauma, a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ and having pled guilty to a felony offense, George Carr told his presentence interviewer that he "[doesn't] really see a future for himself." Presentence Investigation Report ("PSR") at 20. Mr. Carr's pessimism is understandable based on any honest evaluation of the first 23 years of his life.

Mr. Carr was born to a biological mother who neglected him, causing him to be placed in foster care as a young child. PSR at 18. At age four, he was adopted by two men whose relationship promptly dissolved. *Id*. Mr. Carr lived with one adoptive parent, a man who struggled with drug addiction and homelessness. *Id*. at 19. During those years, Mr. Carr was frequently hungry, sometimes homeless, and repeatedly neglected – including on two different occasions when Child

---

[1] The defendant candidly requests a period of time served, followed by a lengthy period of supervised release. But he understands that his request must be tempered by the factors set forth by statute. This memorandum seeks to address each of those factors.

1

and Family Services Agency of District of Columbia ("CFSA") discovered that he had been left unsupervised for multiple days. *Id*. at 17–19.

At age 10 or 11, Mr. Carr began using marijuana regularly. *Id*. at 21. He demonstrated significant behavioral and attention problems as early as elementary school. *Id*. at 22. Yet Mr. Carr never received proper support services. ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

Unfortunately, Mr. Carr began to accumulate a criminal record roughly a year before ██ ████████████████████████████ and the services that might have unlocked. A 2017 juvenile adjudication was followed by subsequent adjudications and two adult convictions. *Id*. at 6–15. On August 1, 2025, Mr. Carr – armed with a firearm that he pointed at a victim – stole at least $200 from a beauty supply store. *Id*. at 4. He promptly accepted full responsibility for this crime, the crime for which he now must be sentenced. *Id*.

In selecting a sentence "sufficient, but not greater than necessary" to achieve the purposes of sentencing, the Court must consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a). In evaluating "the history and characteristics of the defendant" under a different but related statute, Judge Friedman has previously found that a defendant's childhood "years of extreme complex trauma …weigh[ed] in favor of a sentence reduction." *United States v. White,* 687 F. Supp. 3d 87, 100 (D.D.C. 2023). Similarly, when considering a defendant's "history and characteristics," a court must consider whether "external forces beyond [the defendant's] ability to control created cognitive and psychological impairments that greatly diminished his ability to resist engaging in serious criminal activity." *United States v. Thomas,* 794 F.3d 705, 713 (7th Cir. 2015).

So too, here. Mr. Carr has already accepted responsibility for his armed robbery. PSR at 4. The decision to commit this crime was inexcusable, and he offers no excuse. Mr. Carr simply asks for a sentence that reflects his ███████████████████████████████████████s. These factors call for a sentence well below the 51-month median sentence for the 39 defendants over the past five years with Mr. Carr's primary guideline (§2B3.1), Final Offense Level (23), Criminal History Category (II), with no substantial assistance departure. *Id*. at 29. Yet the government seeks a sentence of 63 months –above the median sentence for similarly situated defendants – in spite of Mr. Carr's personal circumstances that militate in favor of a downward variance. Government's Memorandum in Aid of Sentencing ("GMAS") at 1. All in all, a sentence sufficient to achieve the goals of 18 U.S.C. § 3553(a) must not be blind to Mr. Carr's life story, personal characteristics, and as-yet-untested human potential when given the cognitive and behavioral support that he has yet to receive.

## II.    Procedural History of Case

Mr. Carr was arrested on October 1, exactly two months after the robbery. PSR at 1. Mr. Carr consented to an interview with police, and provided a full account of his participation in the offense. *Id*. On November 12, the government charged Mr. Carr with a single count of Interference with Interstate Commerce by Robbery in violation of 18 U.S.C. § 1951(a). *Id*. at 3. On December 9, Mr. Carr pled guilty to this offense. *Id.* Mr. Carr has "clearly demonstrated acceptance of responsibility for the offense," and "has assisted authorities in the investigation or prosecution of the defendant's own misconduct" by pleading guilty before substantial judicial or prosecutorial resources were expended on his case. *Id*. at 5.

Mr. Carr has been in continuous custody for this offense since October 2, and is confined at the District of Columbia Central Treatment Facility ("D.C. Jail"). *Id*. at 1–2.

5373217.1

### III.    Sentencing Guidelines

In determining Mr. Carr's sentence, the parties have agreed to the following:

- The base offense level is 20. *Id.* at 3, citing U.S.S.G. §2B3.1.

- The offense level is increased by 6 because it involved a firearm. *Id.*, citing U.S.S.G. §2B3.1(b)(2).

- The offense level is decreased by 2 because Mr. Carr has accepted responsibility for his offense. *Id.,* citing U.S.S.G. §3E1.1(a).

- The offense level is decreased by 1 because Mr. Carr timely notified authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently. *Id.,* citing U.S.S.G. §3E1.1(b).

- Mr. Carr is not eligible for a zero-point offender adjustment because he has criminal history points. *Id.* citing U.S.S.G. §4C1.1(a)(1).

- Computing these agreed-upon calculations results in a total offense level of 23.

- Mr. Carr's criminal history score is 2, and his criminal history category is II.[2]

In determining Mr. Carr's sentence, the parties disagree on two general issues:

*First,* the government believes that a high-end sentence is appropriate under 18 U.S.C. § 3553(a). GMAS at 5-8. *Conversely*, Mr. Carr believes that a downward variance from the Guidelines is appropriate under the statutory sentencing factors in 18 U.S.C. § 3553(a), because Mr. Carr's ███████████████████████████████████████,

---

[2] The government had previously contested that certain juvenile adjudications should cause Mr. Carr's criminal history score and category to be higher. Mr. Carr and U.S. Probation disagreed. GMAS at 7; PSR at 30-31. The government has now withdrawn its previous objections. As a result, Mr. Carr's criminal history score is 2 and criminal history category is II. GMAS at 4 n.4. The parties are thus now in full concurrence.

particularly when taken together, "diminished [Mr. Carr's] ability to resist engaging in serious criminal activity." *Thomas,* 794 F.3d at 713.

To the extent any case law incorporated into this memorandum discusses downward departures within the guidelines, Mr. Carr seeks to ensure that – in compliance with the plea agreement in this case – any such reference is merely intended to provide gloss as to Mr. Carr's variance request, but not, in any way, suggest that the Court utilize a departure to achieve what the statute alternatively provides.

Based upon the total offense level of 23 and a criminal history category of II – both of which are now undisputed – the Sentencing Guidelines suggest a guidelines imprisonment range of 51 to 63 months. After reviewing of the relevant sentencing factors, Mr. Carr requests that this Court consider a substantial downward variance under 18 U.S.C. § 3553(a).

## IV.    Criminal History

### A.    Adult Convictions

Mr. Carr has been convicted of two previous crimes in his adult life. On February 27, 2024, when Mr. Carr was 21 years old, he was convicted of attempted threats to do bodily harm. This conviction stemmed from an incident where Mr. Carr made a series of threatening phone calls to a local restaurant, and then made statements indicating ███████████ when confronted by police. The latter statements contextualize a recurring theme of despair implied throughout the PSR. Nearly one year later on February 10, 2025, when Mr. Carr was 22 years old, he was convicted once again of attempted threats to do bodily harm. This conviction was due to threatening text messages and a threatening phone call Mr. Carr made to an ex-girlfriend. These two adult convictions result in a subtotal criminal history score of 2, which establishes a criminal history category of II.

### B.        Juvenile Adjudications and School Discipline

Mr. Carr also has several juvenile adjudications and school disciplinary matters from his trauma-filled childhood, a period of time in which Mr. Carr lacked any stable parent or caregiver. GMAS at 10-11 (identifying juvenile adjudications and school disciplinary matters); PSR at 18-20 (discussing circumstances of Mr. Carr's childhood). Under the U.S. Sentencing Guideline Manual, these incidents are not included in calculating Mr. Carr's criminal history. While a juvenile, Mr. Carr was never convicted of a crime as an adult, did not receive a sentence exceeding one year and one month, and both the adjudication and the entirety of Mr. Carr's confinement in a juvenile detention center occurred more than five years ago. U.S.S.G. §4A1.2(d). The government does not rely upon these adjudications to alter the criminal history score. GMAS at 4 n.4. But the government argues that a series of incidents from Mr. Carr's youth – including matters such as "disrupting the classroom" while still a child – nevertheless should warrant a higher sentence in Mr. Carr's adult prison sentence. *Id*. at 10–11. Mr. Carr respectfully disagrees.

As an initial matter, the government offers little legal authority to support its argument that juvenile adjudications (or high school disciplinary issues) that do not meet the U.S.S.G. §4A1.2(d) criteria for inclusion in a criminal history score can nevertheless warrant a high-end sentence. Instead, it cites a string of cases that involve different types of adult misconduct. For example, the government cites *United States v. Settles,* 530 F.3d 920, 923 (D.C. Cir. 2008) to tell the Court that "a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum." But *Settles* involved conduct committed by an *adult,* not a child. In Mr. Carr's case, his juvenile misconduct involves nothing for which Mr. Carr has been "acquitted" or that remained "uncharged." Instead, Mr. Carr was duly

6

adjudicated for the juvenile offenses, and faced school discipline for violations of school rules. These childhood events should not warrant a harsher adult sentence.

Indeed, the D.C. Circuit has said it should not, at least in the departures context. In one such case, the D.C. Circuit ordered a resentencing in a case where the trial court "based its decision to depart" from the Sentencing Guidelines – at least in part – on "inapplicable juvenile convictions" that did not meet the U.S.S.G. §4A1.2(d) criteria for inclusion in a criminal history score. *United States v. Samuels,* 938 F.2d 210, 215-216 (D.C. Cir. 1991). The D.C. Circuit allowed that "a departure may be justified where the defendant had previously received an extremely lenient sentence for a serious crime," but reversed a sentencing decision which seemed to "apply a general concern about leniency to all juvenile sentences." *Id*. at 215. As the D.C. Circuit noted, permitting a longer sentence simply because a defendant had received juvenile sentences that did not count towards criminal history under U.S.S.G. §4A1.2(d) "would undo the careful measurements set down in section 4A1.2(d)(2)." *Id*. After all, the intent of U.S.S.G. §4A1.2(d) is that juvenile offenses that are both remote in time *and* below a certain threshold of seriousness not count towards criminal history. If the mere fact that a defendant possesses juvenile convictions that do not count towards criminal history is evidence of "a pattern of unlawful conduct with minimal repercussions" (GMAS at 9) and becomes an argument for a lengthier sentence, then the strictures set forth by U.S.S.G. §4A1.2(d) become hollow. *See also United States v. Brown,* 892 F.3d 385, 406 (D.C. Cir. 2018) (a sentence that is lengthier than usual for its offense must be based upon something "distinctive" about the defendant's "crime or background that would warrant increasing his sentence beyond the punishment already captured by all the elements that went into his individual Guidelines calculation.").

5373217.1

At least one other circuit agrees. While juvenile crimes excluded from the Sentencing Guidelines may sometimes warrant an upward departure, this only applies to "'serious' or 'large scale' offenses." *United States v. Carrillo-Alvarez,* 3 F.3d 316, 321-322 (9th Cir. 1993), quoting *United States v. Luscier,* 983 F.2d 1507, 1511 (9th Cir. 1993). In *Carrillo-Alvarez,* the Ninth Circuit held that "a juvenile conviction for auto burglary" was not sufficiently serious to justify an upward departure because this juvenile conviction "cannot bridge the gap between [an adult defendant's] record and that of an offender whose record is so egregious that an occasional departure upward…is permissible." 3 F.3d at 222.

To be clear, even though the government seeks a guidelines permissible sentence, the government's memo falls directly into the trap identified by *Samuels* of assuming that juvenile convictions and school discipline issues are almost inherently evidence of "a pattern of unlawful conduct with minimal repercussions" seemingly because they do not result in adult-level punishments or increased criminal history scores. GMAS at 9. Many of the juvenile crimes cited

███████████████████████████████████████████

████████████████████ seem to fall far below the threshold of "serious" or "large scale" offenses identified in *Carrillo-Alvarez* as sufficient to justify an upward departure. GMAS at 10. Other juvenile offenses are appreciably more serious. *Id*. Yet, there is no meaningful explanation as to why any one of these offenses mean that Mr. Carr's culpability for his adult crime should be assessed, in part, by an assessment of juvenile offenses *not* included in the Sentencing Guidelines.

This analysis is even more questionable for school disciplinary incidents. *Id*. While any child's disruption of a learning environment can be frustrating for both students and teachers, this sort of school disciplinary issue is hardly the sort of offense that "would warrant increasing [Mr. Carr's] sentence beyond the punishment already captured by all the elements that went into his

8

individual Guidelines calculation." *Brown*, 892 F.3d at 406. While a high-end sentence – as the government requests – would fall outside the strictures set forth by *Brown*, this Court should nonetheless decline an invitation to use adult prison as a tool for policing these obvious childhood educational issues, particularly given Mr. Carr's deficits, as discussed below.

## V.    18 U.S.C. § 3553(a) Factors

As the Supreme Court has held, the Federal Sentencing Reform Act of 1984 made the Federal Sentencing Guidelines "effectively advisory." *United States v. Booker,* 543 U.S. 220, 245 (2005). While the Court "must consult those Guidelines and take them into account when sentencing," the Court must also consider all seven mandatory factors enumerated in 18 U.S.C. § 3553(a) in order to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing. *Booker,* 543 U.S. at 264, 269; 18 U.S.C. § 3553. If the Court finds that a resolution within the range recommended by the Guidelines would be "greater than necessary to satisfy the statutory purposes under [§] 3553," then the Court may reasonably impose a "below-guidelines sentence instead." *United States v. Staton,* 626 F.3d 584, 585 (D.C. Cir. 2010).

This is a case where a sentence within the Guidelines would be greater than necessary. When the seven statutory factors are considered – particularly the "history and characteristics of the defendant," whose life has been marked by ███████████████████ ███████████████████████████ by those charged with his care – the Court should grant a downward variance from the sentencing range called for by the Guidelines.

Federal law requires the Court to consider mandatory factors in sentencing Mr. Carr. These factors, slightly rephrased, are:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; adequately deters criminal conduct; protects the public from further crimes of the defendant; and provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentences and the sentencing range established by the Sentencing Guidelines;

(5) Any pertinent policy statement issued by the Sentencing Commission in effect as of the date of sentencing;

(6) The need to prevent unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need to provide restitution to any victims of the offense.

18 U.S. Code § 3553(a). As this section will demonstrate, a consideration of factors (1), (2), and (6) counsels a sentence below the Sentencing Guidelines' imprisonment range of 51 to 63 months, and below the 51 months that is the median sentence for similarly-situated defendants.

### A. 18 U.S.C. § 3553(a)(1): Mr. Carr and His Offense

The first statutory factor the Court must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Mr. Carr does not dispute the seriousness of his crime, or its impact on the victim. Indeed, he realized the indefensibility of his conduct almost immediately after his arrest, which drove his decision to provide the police with a full account of the crime and his participation in it, and to plead guilty before the government or Court needed to invest substantial effort in trial preparation or motions practice. Indeed, Mr. Carr wanted to accept responsibility so early that even undersigned counsel intervened to ensure due process and consideration.

Mr. Carr's "history and characteristics" are unusually grim. In addition to reflecting ████████████████████████████████████████████████, Mr. Carr's life story also

10

reflects the collective failure of a number of parents and institutions to provide a young man with almost any of the tools he might need to be a successful member of society. In considering whether "external forces beyond [Mr. Carr's] ability to control created cognitive and psychological impairments that greatly diminished his ability to resist engaging in serious criminal activity," *Thomas,* 794 F.3d at 713, the Court should consider Mr. Carr's history of ████████████ ██████████████████████████████████████████████.

### 1.      Childhood Trauma

Mr. Carr's childhood was marked by repeated homelessness, hunger, neglect, and the absence of any consistent and responsible caregiver. PSR at 17–19. As the PSR details, this neglect may have begun, at least temporally, with Mr. Carr's biological mother, a woman whose last name Mr. Carr does not even know. *Id*. at 18. According to one of Mr. Carr's adoptive fathers, Mr. Carr's biological mother neglected her children, causing them to be placed in foster care. *Id*. At the age of four, Mr. Carr was adopted by a male couple that split up shortly afterwards. *Id*. Mr. Carr lived with one of the two men, ████████████████, who had a drug problem and struggled to remain housed. *Id*. Mr. Carr recalls repeated bouts of homelessness, including nights spent in homeless shelters or in a truck. *Id*. The family was also often hungry. *Id.* The other man who adopted Mr. Carr – ████████████ – faded out of his son's life upon deciding that the child had too many behavioral issues. *Id*. at 19. ████████████ later committed suicide, whereupon Mr. Carr *found* his adoptive father's suicide note. *Id*. While in the care of ████████████, Mr. Carr continued to be neglected and sometimes abandoned. *Id*. at 19. In 2013, when Mr. Carr was 10 or 11 years old, ████████████ left Mr. Carr and his brothers unattended in a motel overnight, causing Mr. Carr to be placed in foster care. *Id*. On another occasion, Mr. Carr and his brothers were left unsupervised at home for several days while ████████████ was incarcerated. *Id*.

11

Without the sort of parental guidance and supervision that a child is supposed to receive, Mr. Carr made a series of unfortunate choices. Mr. Carr began smoking marijuana regularly at age 10 or 11. *Id.* at 21. Mr. Carr continues to use marijuana as a way of self-medicating and "'stop thinking about all the bad things' in his life." *Id*. at 20. He was first arrested at age 13. *Id.* at 13. By age 15, he was first committed to DYRS for a juvenile adjudication, the first of a string of brushes with the law that would continue throughout his childhood and beyond. *Id*. at 6-17.

Mr. Carr's childhood included several identifiable "Adverse Childhood Experiences (ACEs)," including childhood neglect, parental substance abuse, and parental incarceration. *See* Oluwatoyin Ashekun *et al., Adverse Childhood Experiences and Arrest Rates among Individuals with Serious Mental Illnesses,* 51 AM. J. PSYCHIATRY & L. 1, 3 (2023) (listing each of these as ACEs). Adults who experienced multiple ACEs as children are arrested for crimes at a higher rate than adults who experience fewer or no ACEs. *Id*. at 1. This result is intuitive.

Both this Court and other federal courts have recognized that a defendant's exposure to childhood trauma and ACEs can reduce criminal culpability and counsel in favor of a shorter sentence. *See, e.g.*, *White,* 687 F. Supp. 3d at 100 (discussing the IRAA and youth sentencing). The same analysis applies to Mr. Carr, whose "history and characteristics" must here be evaluated under 18 U.S.C. § 3553(a)(1), and who also experienced significant childhood trauma and adversity. *Id.*

In a detailed 2020 opinion, the United States District Court for the Middle District of Alabama explained the rationale for why exposure to ACEs can justify a lesser sentence. *United States v. Carter,* 506 F. Supp. 3d 1204, 1212 (M.D. Ala. 2020). *Carter* involved the sentencing of a defendant with "pervasive trauma during his childhood," who – like Mr. Carr – had begun self-

12

medicating with illegal drugs as a pre-teen, and who – like Mr. Carr – developed a lengthy criminal history. *Id*. at 1208. The court in *Carter* noted that:

> ACEs have neurological effects on children that bear life-long consequences. ACEs affect brain development in ways that make it difficult for people, both during childhood and as they grow up, to modulate their emotions, constrain their impulses, and perform certain executive functions like planning ahead and balancing responsibilities.

*Id*. at 1209–1210. The court noted the existence of veteran treatment courts in Alabama state courts, which reflect "the acknowledgement that culpability is mitigated when an offense stems from combat-related trauma." *Id*. at 1210. The court in *Carter* determined that just as the legal system recognizes that trauma experienced as an adult in a combat zone can lead to criminal misconduct, so too can childhood trauma. *Id*. Such an acknowledgement is appropriate "in light of the apparent impacts of childhood trauma on brain development and functioning." *Id*.

### 2. Cognitive Limitations

In addition to childhood trauma, Mr. Carr also has below-average cognitive ability. ▆▆▆▆ ▆▆▆▆PSR at 24. This is significantly below average, and may be consistent with an intellectual disability. "It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins v. Virginia,* 536 U.S. 304, 309 n.5 (2002), citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000). In addition to a below-average IQ, Mr. Carr has also struggled since elementary school to control his impulses and participate in an educational environment. PSR at 24–25.

Mr. Carr's significantly below-average cognitive ability is yet another reason why Mr. Carr struggles to control his behavior. Reduced cognitive ability can be associated with "diminished capacit[y] to understand and process information, to communicate, to abstract from mistakes and

13

learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins,* 536 U.S. at 305. These deficiencies "diminish [the] personal culpability" of a defendant with cognitive limitations, even in cases where it does not negate criminal responsibility. *Id.* (holding that the death penalty is unconstitutional as applied to people with mental retardation). District courts have cited *Atkins* in non-capital sentencing cases, including in cases (as here) where the defendant demonstrates cognitive deficits but has not been diagnosed with mental retardation. *See United States v. Willison,* No. 15-CR-4034 (LTS), 2020 WL 6121159, at *8 (N.D. Iowa Oct. 16, 2020) (quoting *Atkins* in finding that a defendant with IQ of 78 deserved leniency because "the relationship between cognitive capabilities and culpability remains relevant," and "the severity of the appropriate punishment necessarily depends on the culpability of the offender"); *see also United States v. Allen,* 250 F. Supp. 2d 317, 321 (S.D.N.Y. 2003) (finding mitigation under 18 U.S.C. § 3553(b) where defendant was within "borderline range with respect to intellectual capacity").

Here, Mr. Carr's crime obviously reflects an inability to make rational decisions and control his impulses. Mr. Carr risked years in prison to obtain as little as $200 of currency from a beauty supply store, which is not generally known as a cash-intensive business. PSR at 2. Even worse, he brandished a gun at a store employee and placed the weapon against the employee's body – massively increasing his criminal liability – despite no evidence that the employee was even resisting his demand for cash. *Id.* at 4. As with many crimes, these choices were reprehensible. But unlike some other crimes, these choices were stunningly impulsive, irrational, and self-defeating on their own terms. Slightly more sophisticated robbers in Washington, D.C. have obtained far more proceeds with far less criminal liability by simply walking out of retail stores with high-value items. One such thief, for example, recently orchestrated the theft of over

14

$3,000 in merchandise from a series of retail stores in less than two weeks. He was sentenced to less than 2 years in prison for 13 combined thefts. *See* Press Release, U.S. Attorney's Office, Dist. of Columbia, *Crime Spree at CVS Stores in Northwest Results in Prison Term* (Feb. 14, 2025), available at https://www.justice.gov/usao-dc/pr/crime-spree-cvs-stores-northwest-results-prison-term. Of course, Mr. Carr – by using a firearm and the threat of force – is not similar situated. But Mr. Carr's choice of crime – in addition to his decision to turn to crime in the first place – reflects the challenges Mr. Carr faces in logical reasoning and in controlling his impulses. While Mr. Carr is criminally responsible for his actions, he is less culpable than someone who made the same choices with the benefit of typical cognitive skills. Mr. Carr's cognitive "deficiencies do not warrant an exemption from criminal sanctions, but they do diminish [his] personal culpability." *Atkins,* 536 U.S. at 318. This Court's sentence should reflect that.

**3.** ██████████████████████████

In addition to ████████████████████████████, Mr. Carr also suffers from ████████████████████████████ PSR at 19. Both Mr. Carr's ██████ and his ██████████ ██████ mitigate his culpability for his crime.

Courts have recognized that both ████████████████ challenges can justify less harsh treatment. In a case involving a defendant with autism, the United States Court of Appeals for the Fourth Circuit held that it was "legitimate for the district court to consider [a defendant's] autism spectrum disorder as part of the 'history and characteristics of the defendant,'" although the district court was not permitted to rely "almost exclusively on these considerations" to the exclusion of other factors required by 18 U.S.C. § 3553(a)(1). *United States v. Zuk,* 874 F.3d 398, 411 (4th Cir. 2017). In a case where a defendant suffered from "Bipolar Disorder II and an unspecified anxiety disorder," the Sixth Circuit recognized that psychological issues and mental health were legitimate

15

bases for a possible variance or departure. *United States v. Campbell,* 434 F. App'x 507, 509-513 (6th Cir. 2011).

In this case, the evidence clearly shows that Mr. Carr's ███████████████████ undermined his ability to make sound decisions, manage his emotions, and resist impulsively making counterproductive choices. ███████████████████

███████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████

███████████████████████████████ Said differently, Mr. Carr experiences challenges in his daily decision-making that other members of society do not. Because these conditions made it more difficult for Mr. Carr to resist committing a crime that indicated "problems with anger control [and] emotional regulation," he is less culpable for his crime than a person without these disabilities. As the Fourth Circuit held in *Zuk* and the Sixth Circuit held in *Campbell,* the Court may consider whether these conditions justify a variance from the Sentencing Guidelines.

### B. 18 U.S.C. § 3553(a)(2): Purposes of Sentencing

In addition to considering the nature of Mr. Carr and his offense, the Court must also consider the purposes of sentencing. These are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

16

18 U.S.C. § 3553(a)(2). These four factor represent "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States,* 581 U.S. 62, 67 (2017).

Mr. Carr's offense is undoubtedly serious. Yet as the Middle District of Alabama observed in *Carter* as to one specific offender, "protracted incarceration would do little to deter subsequent criminal conduct" by a defendant whose "criminality will remain largely beyond his control" without effective treatment for childhood trauma and other underlying conditions. *Carter,* 506 F. Supp. 3d at 1212. Here, it is imperative that Mr. Carr live in a setting that is best suited to rehabilitation. Indeed, Section 3553(a) requires this Court to consider the need to "provide [Mr. Carr] with needed educational or vocational training, medical care, or other correctional treatment *in the most effective manner.*" 18 U.S.C. § 3553(a)(2)(D) (emphasis added). In considering how to most effectively rehabilitate Mr. Carr, the Court must consider Mr. Carr's unique needs as a person with serious disabilities.

Prison is poorly suited to provide rehabilitative services to anyone. *See* 18 U.S.C. § 3582(a) ("imprisonment is not an appropriate means of promoting correction and rehabilitation"). Prison is, however, especially poorly suited to provide rehabilitative services to a person with ███████ such as Mr. Carr. Proper treatment is critical to help people with █████ function in society and avoid criminal activity. As two psychiatrists note:

> The recommended treatment ███████████████████████████ involves habilitation and skills based educational therapies: applied behavioral analysis, speech therapy, sensory integration therapy, and auditory therapy, among others. Individuals with █████ need therapeutic approaches such as development of fundamental social skills, more general habilitation, and treatments that improve empathy. Training for individuals with █████ that ameliorates their deficits may reduce risk of reoffending. It is important to ensure that individuals with █████ understand properly the consequences of their actions and the impact that their behavior may have on others.

17

5373217.1

Isabella Michna & Robert Trestman, *Correctional Management and Treatment of* █████████ █████████████ 44 J. Am. Acad. Psychiatry & L. 253 (2016).

Yet the federal Bureau of Prisons (BOP) cannot solely be relied upon to provide these rehabilitative services to people with ████████ BOP policy calls for individuals ████████ whose PSR indicates ████████████████████████ to be assigned a special screening code, which is supposed to allow an inmate to be "designated to an institution with a Skills program." United States Department of Justice Program Statement 5200.05, Management of Individuals with Disabilities, Oct. 27, 2017, available at https://www.bop.gov/policy/progstat/5200_005.pdf. Skills is the BOP's formal program that helps inmates with ████████ *See* Maureen Baird, Walter Allen Pavlo Jr. & Janet Perdue, ████████ *and the Prison Experience,* Crim. Just., Fall 2023, available at https://www.americanbar.org/groups/criminal_justice/resources/magazine/2023-fall/████████ prison-experience/. Upon information and belief, this program is only available to inmates at two federal prisons: FCI Coleman, Florida (a medium-security facility) and FCI Danbury, Connecticut (a low-security facility). *Id*. If Mr. Carr's security level does not match either of these two facilities, he would likely not receive even "████████████████████████ *Id*.

Nor is the Skills program a magic bullet. In a lengthy 2021 opinion justifying a significant downward departure for a defendant with autism, the United States District Court for the District of Kansas acknowledged that the Skills program exists broadly to help "developmentally disabled persons survive in the difficult prison culture." *United States v. Huseth,* No. 18-20027 (JAR), 2021 WL 4940915, at *15 (D. Kan. Oct. 22, 2021). But while the class of "developmentally disabled persons" who receive services from the Skills program *includes* people with autism, the court found that "[t]he Skills Program…has not been adapted to those with ASD and their unique needs. And *there is no therapy specific to ASD available in the BOP*." *Id*. (emphasis added).

5373217.1

A lengthier prison sentence than necessary would be particularly detrimental to efforts to rehabilitate Mr. Carr, ███████████████████████████████████████████████ ████████████. As Baird, Pavlo, and Perdue note, "[p]rison, for any individual, is difficult, but for those with ████ it can be torturous." *Id.* People with ██████ typically experience distress from "the myriad of stimuli" including loud noises, bright lights, uncomfortable tactile experiences from prison uniforms and pat-downs. *Id.* ███████████████████ ███████████████████

███████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ As Baird, Pavlo, and Perdue note, this could result in a "tortuous" prison experience for an inmate with ███████████████████████████████████, Crim. Just., Fall 2023. The Court's sentence should reflect the counterproductive effects these experiences will inevitably have in helping Mr. Carr to better live ████████████, which is an essential part of rehabilitating Mr. Carr and returning him to civil society.

████████████████████████████ can contain experiences even worse than sensory dysregulation. Interactions between inmates are typically governed an unwritten code of social expectations that inmates ██████████ learn to intuit, but that inmates ██████████ struggle to understand. *Huseth,* 2021 WL 4940915, at *15. This can place inmates with disability at risk of physical or sexual assault, manipulation, segregation, or administrative punishment. *Id.* ████

19

5373217.1



███████████ Mr. Carr's inability to understand his fellow inmates and their social expectations could easily lead Mr. Carr to experience trauma in prison that would be detrimental to efforts to rehabilitate him.

As this Court knows, Mr. Carr previously had court-appointed support services, through ████████████████ Undersigned counsel believes that ███████████ will attend sentencing (via cross-country travel), and would speak on his behalf during sentencing, to the extent the Court allows it. ████████████ acknowledges Mr. Carr's weaknesses (*see* PSR, at 20), but also recognizes that Mr. Carr never really had a chance to develop, let alone succeed. As noted by U.S. Probation, "████████████ hopes the Court will give considerable weight to his experiences growing up and his history of ███████ *Id.* When considering the fact that ████████████ appears to be one of Mr. Carr's closest supporters – i.e., not a single family member or meaningful friend – it gives full gloss and context as to Mr. Carr's existence up to now. While the Court can and should consider the gravity of his crime, it also should not ignore the pathway to this inflection point.

### C. 18 U.S.C. § 3553(a)(6): Unwarranted Sentencing Disparities

The Court must also craft a sentence which reflects "[t]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In this case, the government and the United States Probation

5373217.1

Office have both recommended lengthier sentences for Mr. Carr than those given to "defendants with similar records who have been found guilty of similar conduct." *Id*.

As the PSR notes, the median similarly-situated defendant receives a sentence of 51 months:

> During the last five fiscal years (FY2020-2024), there were 39 defendants whose primary guideline was $2B3.1, with a Final Offense Level of 23 and a Criminal History Category of II, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 38 defendants (97%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 55 month(s) and the median length of imprisonment imposed was 51 month(s). For all 39 defendants in the cell, the average sentence imposed was 54 month(s) and the median sentence imposed was 51 month(s).

PSR at 29.

The Sentencing Reform Act exists so that "those who commit crimes of similar severity under similar conditions receive similar sentences." *Freeman v. United States,* 564 U.S. 522, 533 (2011) . Yet it is unclear why Mr. Carr is somehow more in need of punishment – that is, should be treated worse – than the 39 other defendants whose cases are analyzed in the PSR. It cannot be because Mr. Carr's crime by category is worse. The 39 defendants had the same primary guideline and Final Offense Level. It cannot be because Mr. Carr's adult criminal record is worse. The 39 defendants had the same Criminal History Category.

The only rationale offered or discerned for recommending a sentence which is a full year longer than the median similarly-situated defendant is because of Mr. Carr's juvenile offenses and school-aged misbehavior. GMAS at 10 –12. That is, Mr. Carr should be punished as an adult for crimes he committed or school rules he broke as a child, even though those juvenile offenses are explicitly excluded from consideration under the Sentencing Guidelines. To be clear, undersigned counsel does not cast any aspersion on opposing counsel for the government's request, who has conducted this matter fairly and with the utmost professionalism. Nevertheless, Mr. Carr's patently

sad childhood – a period in which, in the words of ███████████, "the system…failed George at absolutely every turn" PSR at 20, should be taken into consideration. Alternatively, Mr. Carr's history and characteristics all represent good reasons why Mr. Carr should receive a shorter sentence.

Finally, while the thrust of §3553(a)(6) is to ensure comparative sentences across the nation for similarly-situated conduct, a review of even local cases is informative. For example, Judge Chutkan sentenced Mr. Damion Byrd and Mr. Willie Quinones for their respective Hobbs Act robberies to 90 months and 144 months, respectively. *See United States v. Damion Byrd*, 23-cr-54-TSC (Minute Order, July 29, 2024); *United States v. Willie Quinones*, 16-cr-223-TSC (Minute Order, July 2, 2019). But Mr. Byrd's case involved two distinct armed robberies, and Mr. Quinones's case involved outsized criminal conduct beyond a single incident. *See id.* Judge Berman Jackson sentenced Mr. Glenn Dolford to 42 months' imprisonment, for *two* separate armed robberies, despite the existence of an additional and existing 22-year sentence in D.C. Superior Court for murder. *United States v. Glenn Dolford*, 23-cr-190-ABJ (Minute Order July 18, 2025); at https://www.justice.gov/usao-dc/pr/spree-violent-robberies-nets-previously-convicted-killer-additional-42-months-federal. Several crew defendants were convicted of conspiracy to commit Hobbs Act robbery and 18 U.S.C. § 924(c) for multiple jurisdiction armed robberies of South Asian jewelers. Conspirators received sentences of 57 to 111 months' imprisonment, based on their relative roles. *See* http://justice.gov/usao-dc/pr/member-violent-crew-robbed-south-asian-jewelers-gunpoint-sentenced-9-years-prison (listing sentences of conspirators).

As this Court knows and appreciates, no one case is the same. But the above sentences in this district illustrate that the government's request (and Probation's recommendation) is outsized compared to these more culpable or aggressive defendants. Moreover, this particular case

22

combines a number of obvious mitigators: a single robbery incident with no injury; a young defendant; a history of mental illness; and a lack of any family or neighborhood support whatsoever. None of this diminishes the crime, but it contextualizes whether this individual is truly a "lifelong criminal who has never been held accountable for his actions." GMAS at 1. Conversely, Mr. Carr's request for a substantial downward variance is both reasonable and warranted, particularly in light of §3553(a)(6).

## VII.    Conclusion

Based on the aforementioned argument, and balancing the factors required by law, the defendant, Mr. George Carr, hereby seeks a substantial downward variance. To the extent he is sentenced to an additional term of imprisonment, he seeks a recommendation that he be placed in a facility ███████████████████, including, but not limited to (in the following order): FMC Butner (specializing in psychiatry); FCI Danbury; FCI Coleman; or any mental health step down site that will match his custody and care level.

Respectfully,

*/s/ Gregory Rosen*
GREGORY ROSEN
D.C. Bar No. 90036007
ROGERS JOSEPH O'DONNELL PC
Shareholder
1500 K Street N.W., Suite 800
Washington, D.C. 20005
grosen@rjo.com
(202) 777-8952

23

5373217.1